MANSFIELD, Justice.
I. Introduction.
This certiorari proceeding requires us to address the agricultural exemption from county zoning. See Iowa Code § 335.2 (2011). The property owners who brought this action had a lengthy dispute with Linn County over whether houses they had built were subject to the county’s zoning and subdivision ordinances. We are asked to review two separate decisions by the Linn County Board of Adjustment — in 2004 to deny an agricultural exemption for a 6.52-acre parcel that included the property owners’ residence; and in 2007 to deny an agricultural exemption for a second house on a 43.3-acre parcel that the property owners argued was an additional farmhouse. Although the issues are close, we ultimately conclude substantial evidence supports the Board’s determinations that the houses at issue were not “primarily adapted, by reason of nature and area, for use for agricultural purposes.” Id. In reaching our conclusions, we are significantly aided by the thorough and well-reasoned opinions authored by the district court and both the majority and the dissent of the court of appeals.
II. Facts and Procedural Background.
The history of this matter is complicated, but we will attempt a summary. In 1995, the Langs acquired a 48.9-acre parcel near Springville in Linn County. At the time, the parcel contained one single-family dwelling. The property includes grassland, trees, and a pond.
Using the farmstead split process, the Langs subdivided a parcel from the 48.9 acres consisting of the original house (House # 1) and approximately 1.86 acres around it. They sold that parcel to a third party in 1997.
The Langs then built a second house (House # 2) on the remaining forty-seven acres. They occupied that house for a period of time. In 1999, the Langs petitioned repeatedly to have a separate parcel consisting of the second house and a surrounding 3.7 acres rezoned residential. The county turned down these requests. Ultimately, the Langs subdivided and conveyed the 3.7 acres with the second house to Mr. Lang individually. In 2002, the county approved the subdivision, but made clear that it was doing so on the basis of an agricultural exemption, and “[i]f at any time this tract is sold and no longer has agriculture occurring or the house is occupied by persons not ‘engaged in agriculture,’ this parcel may be considered to be nonconforming unless in compliance with zoning regulations in effect at that time.” Later that year, Mr. Lang sold the 3.7-acre parcel including House # 2 to another third party.
The Langs wanted to build two additional houses (House #3 and House #4) on the remaining 43.3 acres, which they still owned jointly. Linn County zoning prohibits more than one dwelling on a single piece of property. Thus, the Langs applied for an agricultural exemption from the zoning ordinance, representing that both houses would be occupied by the Lang family and would be engaged in the *3 fanning operation on the property. The county granted the exemption in May 2000, but cautioned that “the property may not be eligible to be subdivided” and the Langs should be aware “of the implications of two dwelling units on the same parcel of land.”
In August 2002, the county issued a notice of zoning violation for the Langs’ property (the 43.B acres with the two houses). Although the Langs had personally moved into House #4, the county maintained that the other house (House # 3) had never been occupied by Lang family members but instead was being rented out to tenants who were not participating in the farming operation. As a result, according to the county, Mr. Lang was in violation of the zoning ordinance prohibiting more than one house on a property. Following a trial in July 2003, the district court ruled in the county’s favor. It found the occupants were “mere tenants” and “it is quite a stretch to state that these occupants are ‘engaged in the agricultural operation.’ For the most part, these occupants inure their livelihood from activities off the property and wholly unrelated to agriculture.” The court enjoined Mr. Lang from having House # 3 occupied by someone who was not engaged in the farming operation and further ordered that the house “remain vacant until the Defendant provides satisfactory evidence to the Plaintiff that the house would be occupied by someone engaged in the farming operation.” The court also imposed a $500 civil penalty under the Linn County Code of Ordinances. Mr. Lang did not appeal this order.
In February 2004, the county initiated contempt proceedings against Mr. Lang. Following a hearing in June 2004, the district court adjudicated Mr. Lang in contempt, determining that he had willfully disobeyed the court’s prior order. The court fined Mr. Lang $500. The court found that Mr. Lang had arranged for other tenants to occupy House # 3 without notifying the county and that the tenants were again not actively engaged in the farming operation. The court added:
The Court wholly discounts Mr. Lang’s assertion that these tenants served as a ‘security guard’ and therefore are engaged in the farming operation. Mr. Lang lives on the same parcel.... There is nothing unique about a tree farm or a fish farm which necessitates any more security than any other farming operation in this state.
For the most part, the labor-intensive part of the tree farm and fish farm have already been concluded. While it may be the case that from time to time additional trees will need to be planted, there is little other activity with regard to the tree farm for anyone to do other than occasionally walk the area to check for damage or disease. Mr. Lang can certainly accomplish this fact without hiring it done....
Mr. Lang pays no money to have these persons engaged in his farming operation. To the contrary, he only claims that they are the benef[iciaries] of reduced rent. Quite obviously, if the house is not occupied, Mr. Lang would be receiving no rent, so even reduced rent is a benefit to him. Furthermore, Mr. Lang has provided no evidence that the rent for this property is in fact substantially lower than other rural properties of similar kind and character.
... It well appears to this Court that Mr. Lang acts first and then chooses later to reconcile his conduct with the ordinance.
Mr. Lang did not appeal this contempt finding.
Meanwhile, in September 2003, the Langs began to attempt to solve their two- *4 house problem in a different way. They subdivided their property once again by conveying 6.52 acres of the 43.3 acres to Daryl Lang, individually. This 6.52-acre parcel included the larger of the two houses (House #4 — the one the Langs occupied), but not the smaller “tenant” house (House #3). The Langs figured that if both properties could qualify separately as farm properties with their own farmhouses, the entire 43.3 acres and both houses would benefit from an agricultural exemption.
The 6.52-acre parcel was in the shape of a long and narrow rectangle. One end of the rectangle connected to the road. House #4 was at the other end, with a driveway running the length of the rectangle. The proposed subdivision included a fragment of the pond, which House #4 overlooked.
In December 2003, the county cited Mr. Lang for a zoning/subdivision violation because the minimum home lot size in that area of the county was thirty-five acres unless an approved plat existed (and none existed here for the 6.52-acre parcel). Mr. Lang responded by seeking an agricultural zoning exemption from the county for “a house located on a 6.52-acre tract of land.” On his exemption sheet, Mr. Lang listed the following crops as being produced on the property:
Trees, 4-5 acres, 80% for commercial production
Raspberries, 0.1 acres, 10% for commercial production
Blackberries, 0.1 acres, 10% for commercial production
Asparagus, apples, 1.0 acres, 75% for commercial production
Grapes, tomatoes, 0.2 acres, 15% for commercial production
Mr. Lang’s request for an exemption was denied by the county’s zoning administrator. Mr. Lang appealed to the Linn County Board of Adjustment, and in June 2004, a hearing took place. The fighting issue was whether the Langs’ residence (House # 4) could qualify as a farmhouse now that it was only attached to the 6.52 acres.
Photographs that were introduced into evidence at the June 2004 hearing revealed that House # 4 on the 6.52 acres was quite substantial with two-story gabled wings. Surrounding the house was a well-kept lawn.[1]
Although the Langs claimed to be producing trees, raspberries, blackberries, asparagus, apples, grapes, and tomatoes on the 6.52 acres in their exemption filing, they provided no records of production or sales. The photographs indicated that the raspberry bushes were wild and in a wooded thicket. So was the grapevine. The asparagus appeared to be wild as well. There was a photograph showing three apple trees. The Langs did buy approximately 3400 infant trees at a cost of approximately $1500 from the State Forest Nursery, a division of the Iowa Department of Natural Resources (DNR), and had planted some of them on the 6.52 acres; the record does not indicate how many were planted there as opposed to on the other parcel. Nonetheless, the 6.52 acres clearly contained a large number of young trees, as well as preexisting wild trees.[2]
*5 The Langs established at the Board hearing that they had enrolled their tree planting in DNR’s Resource Enhancement and Protection (REAP) program. Additionally, they pointed out that portions of the remaining thirty-five-plus acres (what was left behind after the conveyance of the 6.52 acres) were enrolled in the United States Department of Agriculture’s Conservation Resource Program (CRP). The Langs also argued at considerable length that House #4 could be considered a farmhouse because they owned other farmland in Jones County, Johnson County, and elsewhere in Linn County. They insisted that the house did not need to be contiguous, or even near, the farmland that gave the house “farmhouse” status.[3]
No neighbors appeared at the Board hearing in support of the Langs’ request for an agricultural exemption for their house. Two neighbors testified in opposition. One of them, the purchaser of the original house from the Langs on the 1.86 acres, said that “more and more houses have been added” and that he felt he was “living in a development.” He explained that he had paid the Langs more than the asking price for his house because the farmhouse split had been completed, and he did not expect further development. Another neighbor said that if the exemption were granted by the county, “anyone claiming to be a farm could build and split out the house and build and split the house without meeting any zoning requirements.”
The zoning administrator contended at the Board hearing that “based on the pattern of events in the past, the size and the current use of the parcel, and the occupants’ tenuous involvement if any in agriculture, ... the subject house cannot be considered to be a farmhouse.” The zoning administrator said that it was important to look at the “surrounding events” because there was no clear, bright-line legal definition of what constitutes a farmhouse. The zoning administrator therefore recommended denial of the agricultural exemption for the house.
At the conclusion of the hearing, the zoning administrator’s determination was upheld by the Board on a two-to-two divided vote. See Iowa Code § 335.17 (indicating that the concurring vote of three members of the board shall be necessary to reverse any decision of the administrative official).
Unable to obtain county approval for the carve-out of the 6.52 acres that included House #4, the Langs sought certiorari review from the district court. The certio-rari proceeding over the June 2004 Board proceeding comprises the first part of the Langs’ present appeal.
In the meantime, the Langs tried again to obtain an agricultural zoning exemption from the county for two houses (House # 3 and House # 4) on the full 43.3 acres (i.e., an unsubdivided property). As before, this effort was based on having a tenant in House # 3 who was an active participant in the agricultural operation.[4] A lease was prepared between the Langs and their proposed tenants, Edwin and Bernice Tiernan. The lease was submitted to the county and specifically provided that “Mr. Tiernan’s contribution to the Agricultural Operation will never be less than 24.5 hrs/wk and usually will be more than this.” Various chores were listed with corre *6 sponding minimum times for performing those chores. For example, the lease required that Mr. Tiernan “case” (or inspect) the tree farm a minimum of 1.5 hours per day.
In February 2005, by a three-to-two vote, the Board overruled the recommendation of the zoning administrator and granted an agricultural exemption for the Tiernans’ proposed tenancy for House # 3. However, the Board required Mr. Tiernan to keep and file a log documenting “the number of hours and nature of work performed” in order to allow the county to monitor on an ongoing basis whether the Tiernans’ occupancy of the house would continue to qualify for an agricultural exemption.
Mr. Tiernan died late in 2006, and Ms. Tiernan moved out in March 2007. At this point, the Langs sought to have Ms. Lang’s son and his family move into the house. This would have been a violation of the July 2003 court order unless the Langs first sought the county’s approval and demonstrated that the proposed use of House # 3 would meet the criteria for an agricultural exemption. The Langs indicated that Ms. Lang’s son would perform the same tasks Mr. Tiernan had been doing.
The county zoning administrator reviewed the Tiernan 2005-2006 log reports. Based thereon, he recommended denial of the Langs’ request for a continued agricultural exemption for House # 3. Even accepting the log as true and accurate, the administrator concluded that Mr. Tiernan had spent only an average of 2.6 hours per workday, or well less than half-time, on tasks that could be classified as agricultural. Thus, the administrator concluded that House # 3 could not be considered a second farmhouse on the property, as the tenants were not “primarily engaged in agriculture.”
In May 2007, this matter went to a hearing before the Board. House # 3, a ranch house, is not as large as House # 4. At the hearing, the Langs reported that they had planted thousands of trees on the land, that they had stocked fish in the pond (although no fish had ever been harvested and no one had ever been charged to fish there), and that sheep grazed on the land.
Two neighbors appeared at the Board hearing and questioned the accuracy of the log. One said Mr. Tiernan was a
nice old guy and he was very sick and he probably didn’t do a tenth of the hours.... He wasn’t able.... He went to Iowa City and had a bone marrow transplant and was in terrible shape and he finally died.
This neighbor added that the sheep did not belong to the Langs; they belonged to someone else. As he put it, the Langs “bring them in when they have a case before [the county] and they [the sheep] go back home when the case is over or a little after.” He added that the person who owned the sheep (not Mr. Tiernan) came and checked on them daily while they were on the Langs’ property.[5] The neighbor concluded, “It would be handy for everybody if we could all have a noninspected, nonconforming house, rent it out, and call it a farmhouse.”
Another neighbor said, “In my opinion it’s a backdoor opportunity to develop a housing development.” She acknowledged that Mr. Tiernan was living in the house, but she said he was fighting cancer and “a *7 lot of times we didn’t see him come out of the house.” As at the previous hearing, no neighbors appeared in support of the Langs.
As noted, the Langs indicated their son would be taking over Mr. Tiernan’s role in the farm operation. But when she was specifically asked, Ms. Lang acknowledged that her son would be working an off-farm job to support his family. She did not state what that job was or how much time it would take.
After hearing the evidence, the Board voted three-to-one to deny an agricultural zoning exemption for the planned occupancy of House # 3. The Langs sought cer-tiorari review from the district court of this determination as well. The district court subsequently consolidated this proceeding with the separate proceeding challenging the June 2004 Board decision.
On April 14, 2011, the district court issued a lengthy ruling in the combined case. It found that substantial evidence supported both the Board’s decision in June 2004 to deny the agricultural exemption to House #4 on the 6.52 acres, and the Board’s decision in May 2007 to deny the agricultural exemption to House #3 on the 43.3 acres (that also included House #4). Accordingly, it denied the Langs’ petitions for writ of certiorari.
The Langs appealed, and we transferred the case to the court of appeals. The court of appeals affirmed the district court’s ruling in a split decision, with one panel member dissenting. We granted further review.
III. Standard of Review.
The parties agree that the Board’s factual findings should be reviewed for substantial evidence. See Bontrager Auto Serv., Inc. v. Iowa City Bd. of Adjustment, 748 N.W.2d 483, 495 (Iowa 2008) (interpreting the identically worded provisions of chapter 414 — regarding city zoning). “If the reasonableness of the board’s action is open to a fair difference of opinion, the court may not substitute its decision for that of the board.” W & G McKinney Farms, L.P. v. Dallas Cnty. Bd. of Adjustment, 674 N.W.2d 99, 103 (Iowa 2004) (citation and internal quotation marks omitted). We, of course, review claimed legal errors for correction of errors at law. Id.
IV. Legal Analysis.
Chapter 335 of the Iowa Code empowers counties to engage in zoning. However, section 335.2 provides:
Except to the extent required to implement section 335.27, no ordinance adopted under this chapter applies to land, farm houses, farm barns, farm outbuildings or other buildings or structures which are primarily adapted, by reason of nature and area, for use for agricultural purposes, while so used.
Originally, this provision read:
No regulation or ordinance adopted under the provisions of this act shall be construed to apply to land, farm houses, farm barns, farm outbuildings or other buildings, structures, or erections which are adapted, by reason of nature and area, for use for agricultural purposes as a primary means of livelihood, while so used.
See 1947 Iowa Acts eh. 184, § 2 (codified at Iowa Code § 358A.2 (1950)).
In 1963, the general assembly amended the relevant part of the statute by changing the clause, “which are adapted, by reason of nature and area, for use for agricultural purposes as a primary means of livelihood, while so used,” to the present version. See 1963 Iowa Acts ch. 218, § 2 (codified at Iowa Code § 358A.2 (1966), currently found, as amended, at Iowa Code *8 § 335.2 (2011)). Thus, the general assembly deleted the requirement that the agricultural use of the property had to be “a primary means of livelihood,” but added a requirement that the property had to be “primarily” adapted to agricultural use.
Accordingly, following the 1963 amendment, the plain language of section 335.2 makes it clear that an applicant for an exemption must demonstrate that the “land, farm houses, farm barns, farm outbuildings or other buildings or structures” are “primarily adapted” for the asserted agricultural purpose. An applicant can demonstrate this based on “nature and area.”
In this proceeding, the district court concluded that the 6.52 acres of land with House # 4 were “not primarily adapted, by reason of nature and area, for use for agricultural purposes” and, therefore, upheld the Board’s June 2004 denial of that exemption. Additionally, the court upheld the Board’s May 2007 denial of the exemption with respect to House # 3 under the two-house scenario with Ms. Lang’s son and family occupying House # 3. There as well, the district court concluded that the alleged farmhouse was not “primarily adapted, by reason of nature and area, for use for agricultural purposes.” See Iowa Code § 335.2.
We most recently had to interpret section 335.2 in Kuehl v. Cass County, 555 N.W.2d 686 (Iowa 1996). There, we held that the plaintiffs were entitled to an exemption from county zoning regulations for the erection of hog confinement buildings on a five-acre site. Id. at 687-89. We concluded:
We believe that a fair reading of the words “for use for agricultural purposes” read in the context of the act refers to the functional aspects of buildings and other structures, existing or proposed. The qualifying words “primarily adapted by reason of nature and area” also refer to the proposed structures and the site on which they are located. We have recognized ... that in determining what uses are for agricultural purposes we view agriculture as the art or science of cultivating the ground, including harvesting of crops and rearing and management of livestock. Applying this standard, it appears without dispute that the structures proposed to be erected by the Kuehls and Hollmans are primarily adapted for agricultural use by reason of the nature of the structures. Moreover, there is no circumstance incident to the site on which they are located that in any way detracts from that purpose.
Id. at 688-89.
We have not previously decided when a house becomes a farmhouse for section 335.2 purposes. However, in 1997, the attorney general issued an opinion. See Op. Att’y Gen. No. 97-1-KL) (Jan. 17, 1997), 1997 WL 994719. Among other things, the attorney general indicated that the individuals inhabiting any farmhouses need to be “engaged in agriculture on the land where the houses are located.” Id. at *5. Based on the 1963 amendment to the statute, the attorney general added that the individuals do not have to be engaged in commercial agriculture as a primary source of income. Id. Yet, “the acreage of the farm involved certainly may be a relevant factor.” Id. at *4.
A. The Board’s June 2004 Determination. In our view, the Board could reasonably conclude that the Langs’ large, manorial residence on the 6.52 acres was a residential tail wagging a farmland dog and that the property as a whole was not primarily dedicated to agriculture. Although the Langs had recently planted small trees, they could not be expected to *9 mature for many years and could be viewed as having an aesthetic purpose. Photographs indicated that the other claimed farming activities were not substantial in scope, even relative to the size of the parcel. The Langs presented no evidence of actual production, beyond the bare claims they made in their application for an agricultural exemption.
Our legislature clearly indicated by the 1963 amendment that the agricultural activities need not be “a primary means of livelihood.” However, the legislature at the same time added the requirement that the property be “primarily” adapted to agricultural use. In our view, this authorizes the county to deny the farmhouse exemption when the record, as here, indicates that the agricultural activities are basically a sideline designed to obtain an agricultural zoning exemption for the owners’ residence. The Board was entitled to look at the relative size, value, and construction date of the house compared to the scope, value, and duration of the claimed agricultural activities. For example, we do not believe the legislature intended to allow a homeowner to avoid county zoning requirements simply by having a tomato patch in his or her backyard.
No one doubts that farm income is subject to ups and downs. Iowa’s farm families have to be entrepreneurs, and often they have to take on second and third jobs. The legislature did not want a farmer to lose a zoning exemption for an acreage just because farm income did not provide most of the dollars needed to put food on the table. Yet, at the same time, by replacing “primary means of livelihood” with “primarily adapted,” the legislature did indicate that the overall importance and scope of the agricultural operation could be considered in determining the status of an alleged farmhouse. See 1963 Iowa Acts ch. 218, § 2.
Furthermore, the legislature continued to make it clear that the “nature and area” of the property could be taken into account. See Iowa Code § 335.2. The term “nature” is often used to refer to the “inherent character” or “essential characteristics” of a thing. See Merriam-Webster’s Collegiate Dictionary 826 (11th ed.2004). Thus, the legislature’s language would appear to authorize a county to look at the underlying realities of the situation.
We believe a recent court of appeals decision is instructive. See Kramer v. Bd. of Adjustment, 795 N.W.2d 86, 92 (Iowa Ct.App.2010). There, a storage lagoon was constructed on farmland to hold organic wastewater from a nearby chon-droitin sulfate plant. Id. at 88. The argument was made that the lagoon should be exempt from county zoning because the wastewater was used for fertilizing the crops on the farmland (although it could not be sold to any other party). Id. at 91. The court of appeals rejected this argument, holding that the wastewater storage lagoon was not “primarily adapted for use for agricultural purposes,” even though the wastewater may have “some fortuitous benefit to crop enhancement.” Id. at 93. We agree with the court of appeals that the “primarily adapted” test allows county zoning authorities to consider the overall importance and underlying purpose of the agricultural activities in question.
The Langs contend that the county applied a minimum-acreage test and flunked the 6.52-acre parcel simply because it was not big enough. It would have been improper to utilize such a litmus test, but the county did not do so. It is true that under the Linn County zoning ordinances, so long as the Langs’ land exceeded thirty-five acres and was used for agricultural production it was conclusively presumed to be entitled to the agricultural exemption. *10 Thus, the county has never disputed that the Langs could treat their residence as an exempt farmhouse while on the 43.3 acres that included the vast majority of the fish pond and all the CRP acreage.
However, the zoning administrator’s report, the recording of the June 2004 hearing, and the report of the Board’s two-to-two decision all indicate that the county did not summarily reject the Langs’ application based on lot size. Rather, it took into account a variety of circumstances and applied the appropriate standard — whether the 6.52-acre lot and house were “primarily adapted, by reason of nature and area, for use for agricultural purposes.” See Iowa Code § 335.2. In particular, the zoning administrator questioned the bona fides and substantiality of the Langs’ agricultural activities on the 6.52 acres.
Once the Langs attempted to subdivide the property so that their residence rested on only 6.52 acres, the relevant question became whether that parcel and the large residence thereon, not some adjoining parcel, were “primarily adapted” to agricultural purposes. The size of the parcel was one appropriate consideration. See id. (stating that “area” is a consideration); Op. Iowa Att’y Gen. No. 97-1-1 (L) at *4. If size were not relevant, then nothing could prevent a developer from obtaining a zoning exemption for an entire development subdivided into half-acre lots so long as some agricultural product were planted in the development and tended by the homeowners.
Like the district court, we view this as a close case, and our decision is largely tied to the standard of review and the statutory requirement that the property be primarily adapted for use for agricultural purposes. Certainly, the statute contemplates the possibility of 6.52-acre farms. But in this case, the county’s determination was supported by substantial evidence.
B. The Board’s May 2007 Determination. The May 2007 hearing concerned whether House # 3 on the 43.3 acres when occupied by Ms. Lang’s son would qualify for an agricultural zoning exemption as a second farmhouse in addition to House #4. Because the county ordinances prohibit more than one dwelling on a single undivided parcel of land, the Langs needed to have an agricultural exemption for House # 3 in order to avoid a violation of the ordinances and the existing court order. The county has never disputed that the 43.3 acres of land, taken as a whole, should be deemed agricultural. However, regardless of the status of the land, section 335.2 anticipates that a county may consider whether a specific building or structure thereon is primarily adapted for use for agricultural purposes. See Iowa Code § 335.2 (stating that “no ordinance adopted under this chapter applies to land, farm houses, farm barns, farm outbuildings or other buildings or structures which are primarily adapted, by reason of nature and area, for use for agricultural purposes, while so used” (emphasis added)); DeCoster v. Franklin County, 497 N.W.2d 849, 853 (Iowa 1993) (considering whether a waste storage basin on agricultural land was entitled to an agricultural zoning exemption and determining that it was); Kramer, 795 N.W.2d at 93-94 (finding that a lagoon on farmland was not entitled to such an exemption).
In recommending denial of the exemption, the zoning administrator emphasized that, based on his reading of the log, the prior tenant had devoted only 2.6 hours a day to what he considered to be agricultural activities. The Langs represented that Ms. Lang’s son was going to perform the same tasks, making the prior tenant’s per *11 formance a fair benchmark.[6] Moreover, Ms. Lang’s son, unlike Mr. Tiernan, was going to have a regular day job, the details of which the Langs did not disclose. In addition, significant evidence emerged at the hearing that the log itself was overstated. Neighbors pointed out that Mr. Tiernan was not outside very much and was undergoing medical treatment for a serious illness. One board member “questioned the number of hours logged for mowing, stating they seemed excessive for the number of acres.” It was also essentially undisputed that Mr. Tiernan had not cared for the sheep, even though the lease presented by the Langs had stated that he would provide an hour of care for them each day.
Based on the foregoing, we believe substantial evidence supports the Board’s finding that House # 3 under the son’s tenancy would not be “primarily adapted” for agricultural purposes. See Iowa Code § 335.2 (stating that the agricultural zoning exemption applies only when the property is “so used” for agricultural purposes). When landowners build an additional house on their land, rent it out, and then want to claim it as another exempt farmhouse, it is appropriate for the county to ask how much time the tenants of the house spend on farming activities. Otherwise, a farmer could erect multiple homes and avoid county zoning simply by assigning nominal farm tasks to an occupant of each home. See State v. Huffman, 20 Ohio App.2d 263, 253 N.E.2d 812, 816-17 (1969) (upholding a finding that the defendant violated an agricultural use zoning ordinance when he allowed two mobile homes to be placed on his property and rejecting the argument that the mobile homes were “incident to” an agricultural use even though one of the tenants worked “occasionally” or “part-time” on the farm).
The Langs claim that the county in effect backtracked on its 2005 agreement when it declined to grant an exemption in 2007. However, the record would support the opposite conclusion: namely, that even though an agreement was reached, it was not fulfilled by the Langs’ prior tenant. This is not to fault Mr. Tiernan; he was seriously ill. But it supports the Board’s decision to deny an agricultural exemption for the planned occupancy of the house by Ms. Lang’s son and his family on the same claimed basis as the prior tenant.
We agree with the district court that the reasonableness of the Board’s May 2007 decision, like its June 2004 decision, was “open to a fair difference of opinion.” We do not foreclose the possibility that there can be more than one exempt farmhouse on a property. Yet, we cannot find that the Board either misapplied the law or lacked substantial evidence for its May 2007 determination.
One final point should be noted. The Langs’ construction of various homes on what began as one property had the potential to cause problems for third parties down the road. When a house has been erected by taking advantage of an agricultural exemption, but then is later sold to a person who is not engaged in agriculture, as occurred in this case with respect to House #2, the house becomes a nonconforming use, which limits the new owner’s ability to modify or, if necessary, to rebuild the house.
IV. Conclusion.
Reviewing the record as a whole, we are impressed by the careful attention devoted *12 to this matter by dedicated public officials. From listening to the recordings of the hearings, it is clear that the members of the Board who cast votes on both sides took their duties very seriously while trying to apply a statute that has some gray areas. As we and the district court have said, the issues are fairly close; reasonable people can reach different conclusions. In the end we are persuaded that substantial evidence supports the Board’s June 2004 and May 2007 decisions.
WRITS ANNULLED; DECISION OF COURT OF APPEALS AND DISTRICT COURT JUDGMENT AFFIRMED.
All justices concur except WIGGINS, J., who dissents, and HECHT and APPEL, JJ., who take no part.

. The photographs of the Langs' property were taken with their permission.

. Mr. Lang's May 2004 "General Tree Management Plan" provided that his objectives were:
To establish a woodland area on property.
To have an opportunity to work with trees. To provide habitat for wildlife.
For future financial potential.
To keep woodland in good condition for future generations.

. Mr. Lang acknowledged, however, that he is not primarily employed in farming.

. As noted before, under the July 2003 court order, so long as both House # 3 and House # 4 were situated on the same parcel, House # 3 had to remain vacant unless the Langs ”provide[d] satisfactory evidence to the [county] that the house would be occupied by someone engaged in the farming operation.”

. Mr. Lang disputed that the sheep were only present when the Langs had a matter before the county, but he did not dispute that they were owned by someone else who actually took care of them.

. As previously noted, under the existing court order, which Mr. Lang did not appeal, Ms. Lang’s son and family could not occupy House # 3 without first demonstrating to the county that the occupancy would qualify for an agricultural exemption.